IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2014 MAY 13  PM 1 46
STEPHAN HARRIS, CLERK
CASPER

| | |
|---|---|
| DIOCESE OF CHEYENNE,<br>CATHOLIC CHARITIES OF WYOMING,<br>ST. JOSEPH'S CHILDREN'S HOME,<br>ST. ANTHONY TRI-PARISH CATHOLIC SCHOOL,<br>JOHN PAUL II CATHOLIC SCHOOL AT ST. MATHEWS, and<br>WYOMING CATHOLIC COLLEGE,<br><br>Plaintiffs,<br><br>vs.<br><br>KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services, *et al.*,<br><br>Defendants. | Case No. 14-CV-21-SWS |

## OPINION AND ORDER DENYING PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction (ECF No. 23). Defendants filed an opposition to preliminary injunction (ECF No. 31), and, with the Court's leave, the American Civil Liberties Union (ACLU) filed an *amicus curiae* brief opposing preliminary injunction (ECF No. 37). The Court heard oral argument on the matter on May 7, 2014. Having considered the parties' briefs, the arguments of counsel, the record herein, and being otherwise fully advised, the Court finds the motion should be denied.

### BACKGROUND

This case pits certain provisions of the Patient Protection and Affordable Care Act of 2010 (ACA) against the Religious Freedom Restoration Act of 1993 (RFRA).

A.   **The Parties and the Issue**

Plaintiffs are several Catholic groups in Wyoming. Defendants are the Secretary of the United States Department of Health and Human Services[1] and various other federal governmental departments and their heads (collectively, "the Government").

Plaintiffs are non-profit religious organizations whose work is guided by Roman Catholic doctrine, which includes the firm conviction that sexual union must be reserved to married couples who are open to the creation of life, and any artificial interference with the creation of life is contrary to church doctrine. (ECF No. 1 at p. 3.) Accordingly, they contend they are prohibited by Catholic belief from providing, paying for, or facilitating access to products or services that limit a woman's natural reproductive capacity, including even education or counseling about such products or services. (ECF No. 24 at p. 8.) Historically, Plaintiffs have exercised this belief by offering a health insurance plan to their employees that omits the objectionable products and services from coverage. Plaintiff Diocese of Cheyenne offers a health plan through a self-insurance trust established by the Catholic bishops of California. (ECF No. 24 at p. 6.) Plaintiffs Catholic Charities, St. Joseph's Children's Home, St. Anthony Tri-Parish Catholic School, and John Paul II Catholic School also offer coverage through the Diocese's self-insurance plan. (*Id.*) Plaintiff Wyoming Catholic College offers health coverage through a self-funded church plan provided by the Christian Brothers Employee Benefit Trust.[2]

---

[1] Plaintiffs named Kathleen Sebelius in her official capacity as Secretary of the U.S. Department of Health and Human Services as the lead defendant. However, in early April 2014, Sebelius resigned her position, and President Obama nominated Sylvia Burwell to replace her. As of this writing, Burwell is awaiting confirmation vote by the Senate. This change will not substantively affect this lawsuit, though. *See* Fed. R. Civ. P. 25(d).

[2] The Government concedes Wyoming Catholic College already is covered by the injunction pending appeal issued by the United States Supreme Court in *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 1022 (Jan. 24, 2014). (ECF No. 31 at p. 2.) At oral argument, though, Plaintiffs asserted that even if Wyoming Catholic College is covered by the *Little Sisters* injunction pending appeal, they seek a preliminary injunction pending the instant litigation because it is unlikely to conclude at the same time as the *Little Sisters* litigation. Therefore, the Court includes Wyoming Catholic College, though part of a different insurance plan, within this Order.

Plaintiffs take issue with the ACA provisions that require health insurance coverage for products and services limiting women's natural reproductive capacity, including women's contraception, sterilization, and related education and counseling. Plaintiffs contend this ACA requirement violates the RFRA because it forces Plaintiffs to "offer health plans that serve as a conduit for the delivery of the objectionable products and services.[3] (ECF No. 24 at p. 12.) This requirement applies to Plaintiffs beginning July 1, 2014, the date their insurance plan year begins. Plaintiffs seek a preliminary injunction to prevent the ACA provisions at issue from applying to them pending the final disposition of this case.

## B.  Relevant Provisions of the Affordable Care Act

Under the ACA, "employment-based group health plans covered by the Employee Retirement Income Security Act (ERISA) must provide certain types of preventive health services." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1122 (10 Cir. 2013) (en banc), *cert. granted*, 134 S. Ct. 678 (2013) (citing 42 U.S.C. § 300gg–13; 29 U.S.C. § 1185d). The provision of the ACA at issue here "mandates coverage, without cost-sharing by plan participants or beneficiaries, of 'preventive care and screenings' for women 'as provided for in comprehensive guidelines supported by the Health Resources and Services Administration.'" *Id.* (citing 42 U.S.C. § 300gg-13(a)(4)). The guidelines that were adopted require health insurance coverage for, among other preventive care, "'[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity,' as prescribed by a provider." *Id.* at 1123 (quoting 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012)). In turn, the Food and Drug Administration (FDA) has

---

[3] Plaintiff's complaint also alleges causes of action under the Free Exercise Clause of the First Amendment, the Free Speech Clause of the First Amendment, the Establishment Clause of the First Amendment, and the Administrative Procedures Act. However, Plaintiffs limit their request for preliminary injunction to their RFRA claim. (Pls.' Br. at 9 n.9.)

approved twenty women's contraceptive methods, "ranging from oral contraceptives to surgical sterilization."[4] *Id.*

The provision exempts "religious employers" from its mandate. *Id.* at 1123. This exemption is limited, though, and protects only "the unique relationship between a house of worship and its employees in ministerial positions." 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013). Currently, this exemption includes only "churches, synagogues, mosques, and other houses of worship, and religious orders."[5] *Id.* In this case, the parties agree this exemption applies to Plaintiff Diocese of Cheyenne, but the Diocese operates a self-insured group health plan that encompasses its employees along with the employees of several other Plaintiffs (all other Plaintiffs except Wyoming Catholic College). Consequently, Plaintiffs assert the Diocese is a proper party in interest subject to the ACA's contraceptive coverage requirement.

In addition to the "religious employer" exemption, the provision also includes an "accommodation," which is central to the instant case. Only eligible organizations are provided the accommodation, which is intended to eliminate (or substantially reduce) any burden the contraceptive coverage requirement imposes upon their religious beliefs and practices. The parties here agree Plaintiffs (other than the Diocese) are eligible for the accommodation. To take advantage of the accommodation, an entity must satisfy four requirements:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
(2) The organization is organized and operates as a nonprofit entity.
(3) The organization holds itself out as a religious organization.
(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of

---

[4] The Court will refer to health insurance coverage for these FDA-approved contraceptive methods as "contraceptive coverage" throughout this Order.

[5] The Tenth Circuit has noted the definition of "religious employer" might change as a new rule has been proposed that would enlarge the category. *Hobby Lobby*, 723 F.3d at 1123–24.

>this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies.

45 C.F.R. § 147.131(b); *see also* 29 C.F.R. § 2590.715-2713A(a); 78 Fed. Reg. 39869, 39873-74 (July 2, 2013). The eligible organization must provide the self-certification form to its insurance company or, if the organization has a self-insured health plan (as is the case here), to its third-party administrator (TPA). 29 C.F.R. § 2590.715-2713A(b). The law then requires the TPA to provide or arrange payments for the objectionable contraceptive products and services, without participation, payment, or interference from the eligible organization. *Id.* Thus, under the ACA, the TPA holds the responsibility to arrange contraceptive coverage for the organization's employees and covered dependents. The purpose of this accommodation is "to route the contraceptive coverage for these organizations through a middleman insurer or insurance plan administrator, allowing the organization to avoid directly providing contraceptive coverage." *Hobby Lobby*, 723 F.3d at 1124 (citing 78 Fed. Reg. 8458–68 (Feb. 6, 2013)). Significantly, the eligible entity (the employer) does not bear any direct or indirect cost associated with providing the contraceptive coverage. 29 C.F.R. § 2590.715-2713A(b)(2); *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 551 (7th Cir. 2014). Thus, once the eligible entity supplies the self-certification to its TPA, the eligible entity plays no further role in arranging for, providing, or paying for contraceptive coverage for its female employees.

C. **<u>Plaintiffs' Position</u>**

Plaintiffs offer a health insurance plan to their employees that omits the objectionable products and services from coverage. (*See, e.g.*, Etienne Aff. ¶¶ 8, 12.) Plaintiff Diocese of Cheyenne offers a health plan through a self-insurance trust, known as the RETA Trust, which was established by the Catholic bishops of California in 1999 for the purpose of providing

medical coverage consistent with Catholic teaching. (*Id.* at ¶ 8.) The Diocese's health plan also covers the other Plaintiffs (except Wyoming Catholic College). (*Id.* at ¶ 11.)

The third-party administrator (TPA) for the health insurance plan is Aetna, Inc. (*Id.* at ¶ 8.) There has been no evidence presented to suggest Aetna holds any religious objections to providing or arranging for contraceptive coverage.

Under the ACA provisions at issue in this case, Plaintiffs have the following options: (1) ensure that their health insurance plan directly offers contraceptive coverage to their female employees, (2) complete and submit the self-certification form to take advantage of the accommodation, (3) refuse to comply with the ACA's contraceptive coverage requirement and incur substantial, potentially ruinous fines for their non-compliance, or (4) cease offering health insurance to their employees altogether. Plaintiffs argue every option is undesirable because the first two options violate their religious beliefs, the third would prevent them from providing charitable services to those in need, and the fourth would inhibit their ability to attract well-qualified employees while preventing them from providing fully for their current employees.

Specific to this case, Plaintiffs refuse to complete and submit the self-certification form to their TPA. They "believe that submitting the self-certification violates their religious beliefs, because doing so makes them 'complicit in an immoral act.'" (Pls.' Br. at 11-12 (quoting *Hobby Lobby*, 723 F.3d at 1142).) "Plaintiffs cannot, consistent with their religious beliefs, offer health plans that serve as a conduit for the delivery of the objectionable products and services." (Pls.' Br. at 12.) Succinctly, Plaintiffs argue that completing the self-certification makes them complicit in their female employees having access to the objectionable contraceptive products and services, which Plaintiffs contend violates their sincerely-held religious belief against providing or enabling access to artificial interference with the creation of life.

Page 6 of 19

## APPLICABLE LAW

With this backdrop in place, the Court turns to the applicable legal principles that must be considered in determining whether a preliminary injunction in Plaintiffs' favor is warranted.

### A. Standard for Preliminary Injunction

For a preliminary injunction to issue, the moving party must prove that four equitable factors weigh in its favor:

> (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*Beltronics USA, Inc. v. Midwest Inventory Distrib.*, LLC, 562 F.3d 1067, 1070 (10th Cir. 2009) (citing *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009)).

Where, as here, a plaintiff alleges a deprivation of RFRA rights, the likelihood of success on the merits and irreparable harm prongs merge. *Hobby Lobby*. 723 F.3d at 1146 ("establishing a likely RFRA violation satisfies the irreparable harm factor") (citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)). Moreover, "because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

### B. The Religious Freedom Restoration Act (RFRA)

Plaintiffs rely on the RFRA as the basis for their preliminary injunction request. The RFRA holds the government shall not "substantially burden a person's exercise of religion" unless the substantial burden "(1) is in furtherance of a compelling governmental interest, and (2)

is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

As the first step for proving their need for a preliminary injunction, Plaintiffs must show a likelihood of success on the merits of their RFRA claim. The Tenth Circuit set forth the test for a preliminary injunction based on the RFRA in *Hobby Lobby*:

> A plaintiff makes a prima facie case under RFRA by showing that the government substantially burdens a sincere religious exercise. *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). The burden then shifts to the government to show that the "compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 420 (2006) (quoting 42 U.S.C. § 2000bb–1(b)). This burden-shifting approach applies even at the preliminary injunction stage. *Id.* at 429, 126 S.Ct. 1211.

723 F.3d at 1125-26.

Broken down, the RFRA analysis involves two steps, and each step has two requirements. In the first step, the plaintiff has the burden of showing (1) their asserted religious beliefs are sincere and (2) the law in question substantially burdens the exercise of those sincere religious beliefs. 42 U.S.C. § 2000bb-1(a); *see also Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001). If a plaintiff carries their burden in step one, the burden shifts to the government to show (1) the challenged law advances a compelling governmental interest, and (2) the law is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000bb-1(b); *see also Hobby Lobby*, 723 F.3d at 1143. To successfully obtain relief from the offensive provision, a plaintiff must carry their burden *and* the government must fail to carry its burden.

## ANALYSIS

The Court begins the preliminary injunction analysis by keeping in mind that a preliminary injunction is an "extraordinary equitable remedy." *Fed. Lands Legal Consortium v.*

*United States*, 195 F.3d 1190, 1194 (10th Cir. 1999).

A. **Likelihood of Success on the Merits and Irreparable Injury**

The likelihood of success on the merits factor (which merges with the irreparable harm factor in RFRA claims such as this) requires the Court to weigh the parties' assertions in light of the RFRA test.

    1. **RFRA Step One: Substantial Burden on a Sincere Exercise of Religion**

The first question to address is whether the ACA's contraceptive coverage requirement substantially burdens Plaintiffs' sincere religious exercise. *See* 42 U.S.C. § 2000bb-1(a). Under this first step, a law substantially burdens a claimant's exercise of religion if it:

> (1) "requires participation in an activity prohibited by a sincerely held religious belief," (2) "prevents participation in conduct motivated by a sincerely held religious belief," or (3) "places substantial pressure on an adherent ... to engage in conduct contrary to a sincerely held religious belief."

*Hobby Lobby*, 723 F.3d at 1138 (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010)). The parties, and the Court, agree the third prong, related to "substantial pressure," applies to this case. *See id.* at 1138-40. In considering substantial pressure, the Court's "only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief." *Hobby Lobby*, 723 F.3d at 1137. Whether substantial pressure exists, though, is for this Court to determine, not for Plaintiffs to pronounce. "[S]ubstantiality—like compelling governmental interest—is for the court to decide." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 558 (7th Cir. 2014) (citing *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011); *see also Yellowbear v. Lampert*, 741 F.3d 48, 56 (10th Cir. 2014) (stating that "a reasonable finder of fact could conclude the prison has substantially burdened Mr. Yellowbear's religious exercise"); *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 108 (2d Cir. 2003) (noting the district court is

the fact finder when considering a request for preliminary injunction).

The Government has not disputed that Plaintiffs' asserted beliefs are sincere and religious in nature. *See United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996) (stating a claimant must establish his or her beliefs to be both religious, rather than philosophical and held sincerely). The Court finds for purposes of this preliminary injunction analysis that Plaintiffs hold a sincere religious belief that the contraceptive products and services at issue are immoral and Catholic doctrine prevents them from providing, paying for, or facilitating access to such objectionable products and services.

The real meat of Plaintiffs' preliminary injunction request hinges on whether the ACA's requirement that Plaintiffs complete and submit the self-certification form substantially pressures Plaintiffs to violate their sincerely-held religious beliefs.

### *1.1 The Form Designates TPA as Administrator of Contraceptive Coverage*

Plaintiffs' sharpest criticism is that completing and submitting the self-certification violates their religious beliefs because it designates the TPA (Aetna) to be the plan and claims administrator for contraceptive coverage. (Pls.' Br. at 12 (quoting 78 Fed. Reg. at 39,879).) Indeed, the self-certification "shall be treated as a designation of the third party administrator as the plan administrator . . . for any contraceptive services." 29 C.F.R. § 2510.3-16. Plaintiffs argue, "In other words, under the accommodation, Plaintiffs are required to amend the documents governing their health plans to designate a third party to provide the objectionable coverage." (Pls.' Br. at 12.) Plaintiffs contend the very act of completing the self-certification form authorizes and even obligates the TPA to provide the objectionable contraceptive coverage.

Plaintiffs are mistaken, though. The self-certification does not authorize or obligate the TPA to provide the objectionable contraceptive coverage; the ACA authorizes and obligates the

TPA to arrange such coverage. As Judge Posner recently explained in the similar case of *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014),

> Notre Dame treats this regulation as making its mailing the certification form to its third-party administrator the cause of the provision of contraceptive services to its employees, in violation of its religious beliefs. Not so. Since there is now a federal right, unquestioned by Notre Dame, to female contraceptive services, the effect of the university's exercise of its religious exemption is to throw the entire burden of administration of the right on the entities (Aetna and Meritain) that provide health services to Notre Dame's students and staff. The university is permitted to opt out of providing federally mandated contraceptive services, and the federal government determines (enlists, drafts, conscripts) substitute providers, and naturally they are the providers who are already providing health services to the university personnel.

*Id.* at 553.

It is not Plaintiffs' self-certification that authorizes or obligates the TPA to ensure the objectionable contraceptive coverage; it is the ACA that does so. "Federal law, not the religious organization's signing and mailing the form, requires health-care insurers, along with third-party administrators of self-insured health plans, to cover contraceptive services." *Id.* at 554. The accommodation allows Plaintiffs to place the ACA-imposed burden of providing contraceptive coverage on the TPA, who in this case has no objections (religious or otherwise) to providing such coverage. The ACA does not force Plaintiffs to offer a health insurance plan with objectionable contraceptive coverage; it forces the TPA (a non-religious third party) to arrange and offer such coverage. The self-certification "enables nothing. The sole 'enabler' is the federal statute that [Plaintiffs] ha[ve] been allowed to opt out of." *Id.* at 557. Completing and submitting the form to the TPA "simply shifts the financial burden from [Plaintiffs] to the government." *Id.* at 555.

Consequently, Plaintiffs' argument that completing the self-certification form requires them to enable access to objectionable contraceptive products and services is inaccurate and

unconvincing. It does not demonstrate a substantial burden upon their religious exercise. The burden is placed on the TPA to comply with the ACA.

### *1.2     Complicity in an Immoral Act*

Plaintiffs also argue that completing the self-certification will violate their religious beliefs because it will make them "complicit in a grave moral wrong" as the end result will be objectionable contraceptive coverage for their female employees. (Pls.' Br. at 15 (quoting *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1218 (D.C. Cir. 2013).) The accommodation, though, permits Plaintiffs to refuse to be complicit. By completing the self-certification, Plaintiffs inform the TPA they refuse to provide contraceptive coverage, and federal law in turn forces the third party to take up the ACA-imposed contraceptive coverage requirement. While Plaintiffs hold very strong religious views that the TPA should not provide (or be forced by federal law to provide) contraceptive coverage, the TPA's provision of such coverage cannot be said to be a substantial burden on Plaintiff's religious exercise. The conscientious objector example in *Notre Dame* is demonstrative:

> Consider this further example illustrative of our doubts. Suppose it is wartime, there is a draft, and a Quaker is called up. Many Quakers are pacifists, and their pacifism is a tenet of their religion. Suppose the Quaker who's been called up tells the selective service system that he's a conscientious objector. The selective service officer to whom he makes this pitch accepts the sincerity of his refusal to bear arms and excuses him. But as the Quaker leaves the selective service office, he's told: "you know this means we'll have to draft someone in place of you"—and the Quaker replies indignantly that if the government does that, it will be violating his religious beliefs. Because his religion teaches that no one should bear arms, drafting another person in his place would make him responsible for the military activities of his replacement, and by doing so would substantially burden his own sincere religious beliefs. Would this mean that by exempting him the government had forced him to "trigger" the drafting of a replacement who was not a conscientious objector, and that the Religious Freedom Restoration Act would require a draft exemption for both the Quaker and his non-Quaker replacement? That seems a fantastic suggestion.

*Notre Dame*, 743 F.3d at 556. The same reasoning applies here. Through the ACA's

accommodation, Plaintiffs have the right to be exempted from participating in, providing, or paying for the costs associated with the objectionable contraceptive coverage based on their sincere religious beliefs, but they have no right to prevent a third party (who does not hold those same religious objections) from meeting the ACA's requirements. *See Michigan Catholic Conference v. Sebelius*, ---F.Supp.2d ---, 2013 WL 6838707, at *7 (W.D.Mich. 2013) ("RFRA does not allow a plaintiff to restrain the behavior of a third party that conflicts with plaintiff's beliefs"). Although the TPA's activities may deeply insult Plaintiffs' genuine religious beliefs, the TPA's activities in providing contraceptive coverage cannot be said to hamper Plaintiffs' religious exercise. *See Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) (finding that collection of the claimant's DNA may offend the claimant's religious beliefs but it does not interfere with his religious exercise) (citing *Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

Something must be said of Plaintiffs' claim that the ACA forces them to contract with a TPA "that is authorized or obligated to provide the objectionable coverage to Plaintiffs' employees." (ECF No. 24 at p. 11 (citing 26 C.F.R. § 54.9815-2713A(b)(2); 78 Fed. Reg. at 39,880).) First, Plaintiffs are mistaken. Nothing in the provisions cited "force" an eligible organization to contract with a third party who will provide contraceptive coverage.[6] Second, the evidence shows Plaintiffs here have contracted with the same TPA (Aetna) since before being subject to the ACA's requirements. (*See, e.g.*, Etienne Aff. ¶¶ 8-9.) This suggests Plaintiffs are far less concerned with their contracting partner than with whether that partner provides contraceptive coverage to Plaintiffs' female employees.

---

[6] The relevant portions of these provisions explain that a TPA who receives a self-certification form must decide whether "to enter into or remain in a contractual relationship with the eligible organization." 26 C.F.R. § 54.9815.2713A(b)(2); *see also* 78 Fed. Reg. 39870, 39880 (July 2, 2013) (explaining that a TPA receiving a self-certification from an eligible organization "and that agrees to enter into or remain in a contractual relationship with the eligible organization" must then arrange for contraceptive coverage).

The accommodation permits Plaintiffs to refuse to be complicit in providing contraceptive coverage to their female employees; it does not force them to be complicit. It permits them to object to such coverage and refuse to provide it themselves. Allowing Plaintiffs to refuse to participate in providing contraceptive coverage does not substantially burden their religious exercise. To accept Plaintiffs' argument under these facts would render the RFRA's substantial burden test meaningless.

### *1.3 Completing the Accommodation Form Does Not Materially Change Conduct*

The self-certification form itself (EBSA Form 700) is two pages long and demands only very basic information, including the eligible organization's name, the representative's name and contact information, and the representative's signature. It requires little different than what Plaintiffs were already doing. Prior to the ACA, Plaintiffs provided a health insurance plan to their employees and informed the plan's TPA (which was Aetna before as well as after they became subject to the ACA) of their refusal to provide contraceptive coverage. Under the ACA, Plaintiffs do the same thing, only on the designated form. *See Thomas v. Review Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (substantial burden upon religion exists where the government puts substantial pressure on the claimant to modify his behavior and to violate his beliefs). Thus, Plaintiffs are not required to "modify [their] behavior." *Id.*

But to be fair, Plaintiffs have not argued the form is too demanding. And they do not take issue with possessing the right to refuse to provide contraceptive coverage. Instead, Plaintiffs argument, at its core, is essentially that their objection to the contraceptive coverage requirement should act to prevent third parties from providing, arranging for, or paying for such coverage. While the wisdom of the accommodation and its procedure may be fairly debated (likely for some time to come), the accommodation's failure to prevent the TPA from providing

the objectionable contraceptive coverage to Plaintiffs' female employees does not render it a substantial burden on Plaintiffs' religious exercise.

Again, the question of substantiality is determined by the Court. *Notre Dame*, 743 F.3d at 558; *see also Hobby Lobby*, 723 F.3d at 1141 (finding a substantial burden was established "as a matter of law"). The ACA does not apply substantial pressure on Plaintiffs' to modify their behavior and violate their beliefs. Instead, the accommodation allows them to continue their pre-existing behavior of informing the TPA they refuse to provide contraceptive coverage based on their religious beliefs. The ACA then requires the TPA to arrange for the contraceptive coverage. Any burden the ACA places upon Plaintiffs to take advantage of the accommodation is miniscule and far from substantial. *See Kaemmerling*, 553 F.3d at 678 ("An inconsequential or *de minimis* burden on religious practice does not rise to this level."). Indeed, the initial draft of the RFRA prohibited the government from imposing *any* burden on religious exercise, but Congress added "substantially" to clarify that "the compelling interest required by the Religious Freedom Act applies only where there is a substantial burden placed on the individual free exercise of religion," and the RFRA "does not require the Government to justify every action that has some effect on religious exercise." 139 Cong. Rec. S14350-01 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch). "Otherwise there would have been no need for Congress in the Religious Freedom Restoration Act to prefix 'substantial' to 'burden.'" *Notre Dame*, 743 F.3d at 558. Requiring Plaintiffs to do that which they've always done, only now on a designated form, does not amount to a substantial burden on religious exercise.

### *1.4 Hobby Lobby Does Not Control This Case*

Plaintiffs rely heavily on the Tenth Circuit's opinion in *Hobby Lobby*, arguing their dilemma "is the exact choice, and the exact penalties, at issue in *Hobby Lobby*." (Pls.' Br. at 14.)

It is not. *Hobby Lobby* does not control this disposition. Despite Plaintiffs' assertions to the contrary (*see id.* at 15), it *is* material that the for-profit plaintiffs in *Hobby Lobby* were required under the ACA to directly provide contraceptive coverage to their female employees. *See Hobby Lobby*, 723 F.3d at 1120-21, 1125; *id.* at 1152 (Gorsuch, J., concurring) ("No one before us disputes that the mandate compels Hobby Lobby and Mardel to underwrite payments for drugs or devices that can have the effect of destroying a fertilized human egg."). The plaintiffs in *Hobby Lobby* were not eligible for the ACA's accommodation available to these Plaintiffs. *Id.* at 1124. Moreover, without the ability to request the accommodation, the plaintiffs in Hobby Lobby either directly paid for the objectionable contraceptive coverage or faced millions of dollars in fines. Quite simply, the Tenth Circuit in *Hobby Lobby* did not address whether the ACA's accommodation creates a substantial burden on religious exercise because the accommodation was not at issue in that case. While *Hobby Lobby* presents an instructive framework for RFRA claims, the Tenth Circuit's substantial-burden analysis in that case does not demand injunctive relief here.

It is significant in this case that Plaintiffs exercise their sincerely-held religious beliefs by declining to comply with the ACA's accommodation requirements. (*See* Pls.' Br. at 15.) Plaintiffs have drawn a line at completing and submitting the self-certification form. It is certainly not for the Court to say whether that line is "acceptable, logical, consistent, or comprehensible." *Thomas*, 450 U.S. at 714. "Courts are not arbiters of scriptural interpretation." *Id.* at 716. However, it *is* for the Court to say whether the burden placed on Plaintiffs' religion by the ACA is substantial under the RFRA. "[W]e reject the notion ... that a plaintiff shows a burden to be substantial simply by claiming that it is." *Conestoga Wood Specialties Corp. v. Sebelius*, 917 F. Supp. 2d 394, 413 (E.D. Pa. 2013) *aff'd sub nom. Conestoga Wood Specialties*

*Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377 (3d Cir. 2013), *cert. granted*, 134 S. Ct. 678 (2013). Here, Plaintiffs have drawn their line in the sand on the insubstantial side of the substantial-burden test. While it is unfortunate that federal law and every citizen's religious beliefs fail to align in every instance, "[n]ot all burdens on religion are unconstitutional." *United States v. Lee*, 455 U.S. 252, 257 (1982). The burden placed on Plaintiffs' religious exercise by the ACA to complete a self-certification form and submit it to their TPA to avoid the contraceptive coverage requirement is not substantial. It is undoubtedly a burden, but a rather *de minimis* one at that. The ACA's accommodation permits Plaintiffs to object to and refuse to provide the objectionable contraceptive coverage to their employees; it does not prohibit the provision of such coverage to those same employees by another party (no matter how much Plaintiffs may wish such to be the case).

The ACA's requirement that Plaintiffs complete and submit the self-certification form to qualify for the accommodation (and avoid paying for or providing contraceptive coverage to their female employees) does not violate the RFRA because it does not substantially burden Plaintiffs' religious practice. Any burden beyond a *de minimis* one is placed instead on the TPA (here, Aetna). Consequently, Plaintiffs have not demonstrated a likelihood of success on the merits of their RFRA claim. Further, Plaintiffs have not shown a likely threat of irreparable harm (which merges with the likelihood of success prong in RFRA claims).

2. **RFRA Step Two: Compelling Interest / Least Restrictive Means**

Finding no substantial burden, the Court does not reach the second part of the RFRA analysis—whether the Government can satisfy the compelling interest test. However, were the Court to reach that step of the RFRA analysis, it would agree with the parties that the Tenth Circuit's analysis of that question in *Hobby Lobby* would be binding. (*See* Pls.' Br. at 16-17;

Defs.' Br. at 16.) In both *Hobby Lobby* and here, the Government advanced the same two governmental interests: public health and gender equality. *Hobby Lobby*, 723 F.3d at 1143; (Defs.' Br. at 16). The Tenth Circuit held these governmental interests were not compelling and the ACA was not the least restrictive means available for furthering those interests. 723 F.3d at 1143-44. The same analysis and result would apply here, if a substantial burden existed to trigger the compelling interest test.

## B.     Remaining Preliminary Injunction Factors

A party seeking a preliminary injunction must first demonstrate irreparable injury is likely before the other preliminary injunction factors will be considered by the Court. *Dominion Video Satellite*, 356 F.3d at 1260. Here, Plaintiffs have not demonstrated their likely success on the merits (which merges with the irreparable harm prong in this RFRA case). Consequently, the Court will not consider the remaining equitable factors for a preliminary injunction. "[I]n First amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby*, 723 F.3d at 1145 (quoting *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir.), *cert. denied*, --- U.S. --- 133 S. Ct. 651 (2012)).[7] The Court finds such to be the case here.

## CONCLUSION AND ORDER

Plaintiffs have not established a likelihood of success on the merits or a likelihood of irreparable injury on their RFRA claim because they have not shown the ACA's accommodation to be a substantial burden upon their religious exercise. A preliminary injunction is an extraordinary remedy that should not be issued unless the moving party's right to relief is "clear and unequivocal." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). Here, Plaintiffs have failed to show their clear and unequivocal right to preliminary injunctive relief.

---

[7] To be clear, RFRA violations are not constitutional violations, but Congress has given the RFRA similar importance by subjecting all subsequent congressional enactments to strict scrutiny. *Hobby Lobby*, 723 F.3d at 1146 (noting that Tenth Circuit case law analogizes the RFRA, a "super statute," to a constitutional right).

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (ECF No. 23) is hereby **DENIED.**

DATED this 13th day of May, 2014.

                                          Scott W. Skavdahl
                                          United States District Judge